UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

HAROLD GRIFFIN,
CDCR #G-18368,
Plaintiff,

vs.

DR. P. SHAKIBA,
Defendant.

Case No. 21-cv-1474-MMA (DEB)

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

[Doc. No. 28]

Harold Griffin ("Plaintiff"), a California inmate proceeding *pro se*, brings this civil rights action pursuant to 42 U.S.C. § 1983, asserting that Dr. P. Shakiba ("Defendant" or "Dr. Shakiba") violated his Eighth Amendment right to adequate medical care. *See* Doc. No. 6 ("FAC"). Defendant now moves for summary judgment. *See* Doc. No. 28. Plaintiff filed an opposition, to which Defendant replied. Doc. Nos. 32, 33. The Court took the matter under submission without oral argument pursuant to Civil Local Rule 7.1.d.1 and Federal Rule of Civil Procedure 78(b). For the reasons set forth below, the Court **GRANTS** Defendant's motion.

# I. BACKGROUND[1]

Plaintiff has been housed at the Richard J. Donovan Correctional Facility ("RJD") since October 2018. Doc. No. 28-4 ("Def. Decl.") ¶ 2. In May 2019, Plaintiff began experiencing symptoms associated with a bunion on his left big toe. Doc. No. 28-6 ("Pl. Depo.") 24:3–25, 46:7–10.[2] Sometime in 2019, Plaintiff was diagnosed with severe hallux valgus deformity. Doc. No. 28-5 at 15–96 ("Def. Ex. B"). A bunion, or hallux valgus, is a bump that forms at the base of the big toe and can cause inflammation and pain. Doc. No. 28-5 ("Feinberg Decl.") ¶ 9.

Plaintiff underwent a bunionectomy on his left foot on August 29, 2019. Def. Decl. ¶ 5; Def. Ex. B at 16. The procedure was performed by orthopedic surgeon Dr. Amory at Tri-City Medical Center ("Tri-City"). Def. Decl. ¶ 5; Feinberg Decl. ¶ 10; Def. Ex. B at 16. The operative report notes that a pin was inserted in Plaintiff's left foot. Feinberg Decl. ¶ 10. It is undisputed that the pin remained in Plaintiff's foot following the surgery. *See, e.g.*, Doc. No. 28-1 ("DSS") Nos. 2, 9.

Plaintiff was transported back to RJD on the evening of August 29 and saw RN Posadas. Feinberg Decl. ¶ 11. RN Posadas contacted the on-call physician, Dr. Luu, who ordered that Plaintiff be seen by an RN in one day, and by his primary care physician ("PCP") within fourteen (14) days. Feinberg Decl. ¶ 11; Def. Ex. B at 60.

On August 30, 2019, Plaintiff saw RN Unson for the one-day follow-up. Feinberg Decl. ¶ 12. RN Unson noted that Plaintiff was ambulatory with a steady gait and not in acute distress. Feinberg Decl. ¶ 12; Def. Ex. B at 61. RN Unson provided Plaintiff with "temp" crutches and documentation temporarily excusing him from work. Feinberg Decl. ¶ 12; Def. Ex. B at 61, 63–64.

---

[1] These facts are taken from Defendant's Separate Statement of Undisputed Facts, Doc. No. 28-1, and Plaintiff's responses thereto, Doc. No. 32, together with the parties' supporting declarations and exhibits. Particular material facts that are not recited in this section may be discussed *infra*.

[2] All citations to Plaintiff's deposition refer to the pagination assigned by the court reporter. All other citations refer to the pagination assigned by the CM/ECF system.

On September 6, 2019, Plaintiff saw Dr. Goyal for the PCP follow-up. Feinberg Decl. ¶ 13. Dr. Goyal noted that there were "no discharge instructions for wound care/splint wear and pin removal." Feinberg Decl. ¶ 13; Def. Ex. B at 65. Dr. Goyal called Dr. Amory's office but was unable to get in contact with Dr. Amory. Feinberg Decl. ¶ 13; Def. Ex. B at 65. Dr. Goyal also contacted the offsite scheduling department at RJD to assist with "obtaining the records/instructions for postoperative plan per Dr. Amory." Feinberg Decl. ¶ 13; Def. Ex. B at 66. At this time, Dr. Goyal prescribed Plaintiff Tylenol #3 with codeine and requested that the follow-up PCP appointment be rescheduled. Feinberg Decl. ¶ 13.

Dr. Shakiba was reassigned to the delta-yard clinic at RJD in September 2019, Doc. No. 28-3 ("Hodges Decl.") ¶ 2, and became Plaintiff's PCP in late September, Def. Decl. ¶ 4. Dr. Shakiba saw Plaintiff for the first time on September 26, 2019 for a follow-up appointment regarding the bunionectomy. Def. Decl. ¶ 5. Dr. Shakiba reviewed Plaintiff's medical record and noted that there were no wound care instructions or post-operative follow-up instructions. Def. Decl. ¶ 5. Dr. Shakiba contacted Dr. Amory's office on that date, but Dr. Amory was out of the office. Def. Decl. ¶ 5. Dr. Shakiba left a call-back number, but Dr. Amory did not return his call. Def. Decl. ¶ 5. Dr. Shakiba ordered an in-person follow-up between Plaintiff and Dr. Amory within two weeks. Def. Decl. ¶ 5; Def. Ex. B at 70.

On October 5, 2019, Plaintiff submitted a Healthcare Services Request Form 7362, stating that the pin had been "push[ed] further into the toe." Feinberg Decl. ¶ 16; Def. Ex. B at 71. Plaintiff saw RN Javier the following day, who noted that the pin was barely visible and appeared to be embedded inside Plaintiff's left big toe. Feinberg Decl. ¶ 17; Def. Ex. B at 72. RN Javier contacted the on-call physician, Dr. Zhang, who ordered an x-ray of Plaintiff's foot. Def. Ex. B at 72.

X-rays were taken on October 7, 2019, revealing that Plaintiff had undergone an interval bunionectomy procedure, and that surgical hardware remained in place including a longitudinal pin. Feinberg Decl. ¶ 18; Def. Ex. B at 73.

Plaintiff saw Dr. Amory on October 11, 2019 for the two-week follow-up Dr. Shakiba requested. Def. Decl. ¶ 6. Dr. Amory noted on physical examination that the pin was not apparent and that "[a]t this stage, we have to pull this pin out." Def. Ex. B at 74. Dr. Amory ordered x-rays and "set him emergently to have his pin removed." Def. Ex. B at 74.

Plaintiff met with Dr. Shakiba upon his return to RJD later that day. At the time of Plaintiff's appointment with Dr. Shakiba on October 11, there were no notes from Dr. Amory. Def. Decl. ¶ 6; Def. Ex. B at 77. During this visit, Plaintiff requested, and Dr. Shakiba granted "lay-in" from work through December 12, 2019. Def. Decl. ¶ 6. At some point later this day, Plaintiff submitted another Form 7362, requesting "pain medication for bunion removal (pin still in toe)." Feinberg Decl. ¶ 21; Def. Ex. B at 78.

On October 14, 2019, Plaintiff saw Dr. Shakiba during a nurse appointment. Def. Decl. ¶ 7. Plaintiff complained of pain in his left foot and reported a burning sensation. Def. Decl. ¶ 7; Def. Ex. B at 79. Plaintiff requested pain medication. Def. Decl. ¶ 7; Def. Ex. B at 79. Dr. Shakiba observed no redness, swelling, or tenderness, but nonetheless started Plaintiff on nortriptyline and ibuprofen for pain. Def. Decl. ¶ 7; Def. Ex. B at 79. Dr. Shakiba recorded that he was "[s]till awaiting the notes from the recent orthopedic surgery follow-up." Def. Ex. B at 79.

On October 15, 2019, Plaintiff submitted a Form 7362, complaining of "very bad pain in left foot." Feinberg Decl. ¶ 23 Def. Ex. B at 80. Plaintiff saw Dr. Shakiba during a nurse appointment for wound evaluation that day. Def. Decl. ¶ 8; Def. Ex. B at 81. Dr. Shakiba noted that Plaintiff's left foot was red and warm. Def. Decl. ¶ 8; Def. Ex. B at 81. Dr. Shakiba started Plaintiff on Bactrim, an oral antibiotic, and called both of Dr. Amory's offices but was unable to reach him at either location. Def. Decl. ¶ 8; Def. Ex. B at 81. During this appointment, Dr. Shakiba reviewed Dr. Amory's most recent note, which noted an immediate removal of the pin. Def. Decl. ¶ 8; Def. Ex. B at 81. Dr. Shakiba submitted an urgent request for removal of the surgical pin. Def. Decl. ¶ 8; Def. Ex. B at 81.

On October 16, 2019, Plaintiff saw Dr. Shakiba for a follow-up appointment. Def. Decl. ¶ 9; Def. Ex. B at 84. Plaintiff confirmed he had received the oral antibiotic and Dr. Shakiba explained that Plaintiff would see the nurse daily to monitor his foot, and that if he did not respond to the medication, he would be sent to the hospital to receive antibiotics intravenously. Def. Decl. ¶ 9; Def. Ex. B at 84.

On October 18, 2019, Dr. Shakiba saw Plaintiff during a nurse appointment and noted that Plaintiff was responding to the antibiotic, as the redness of his foot had improved significantly. Def. Decl. ¶ 10; Def. Ex. B at 85.

On October 23, 2019, Dr. Amory removed the surgical pin from Plaintiff's foot. Def. Decl. ¶ 11; Def. Ex. B at 86. Plaintiff saw Dr. Shakiba for a post-operative follow-up appointment the following day, on October 24, 2019. Def. Decl. ¶ 11; Def. Ex. B at 90. Dr. Shakiba examined Plaintiff's foot and noticed no abnormalities. Def. Decl. ¶ 11. Dr. Shakiba instructed Plaintiff to finish all of the antibiotics. Def. Decl. ¶ 11; Def. Ex. B at 90.

On November 22, 2019, Plaintiff saw Dr. Shakiba for a post-operative follow-up appointment. Def. Decl. ¶ 12. During the appointment, Plaintiff had no complaints and reported that he felt he was healing well. Def. Decl. ¶ 12. Dr. Shakiba reviewed Dr. Amory's recommendations, which included blood work, an x-ray of the left foot, and a follow-up in three months. Def. Decl. ¶ 12. Dr. Shakiba ordered an x-ray, blood work, and a follow-up with Dr. Amory. Def. Decl. ¶ 12. The blood work results showed no positive finding of infection or abnormality. Def. Decl. ¶ 12.

On March 24, 2020, Plaintiff saw Dr. Shakiba for an annual visit. Def. Decl. ¶ 13; Def. Ex. B at 95. Dr. Shakiba noted that Plaintiff had fully healed from the bunionectomy and ambulated without any difficulty. Def. Decl. ¶ 13; Def. Ex. B at 95.

On April 9, 2021, Plaintiff saw Dr. Shakiba for issues unrelated to Plaintiff's foot and bunionectomy. Def. Decl. ¶ 14. Plaintiff expressed no concerns related to the bunion or post-operative care. Def. Decl. ¶ 14. Plaintiff has not seen Dr. Shakiba since this appointment.

## II. DISCUSSION

### A. Legal Standards

#### *1. Summary Judgment*

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* The party seeking summary judgment bears the initial burden of establishing the basis of its motion and of identifying the portions of the declarations, pleadings, and discovery that demonstrate absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party has "the burden of showing the absence of a genuine issue as to any material fact, and for these purposes the material it lodged must be viewed in the light most favorable to the opposing party." *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970). A fact is material if it could affect the "outcome of the suit" under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *See id.*

If the moving party meets its burden, the nonmoving party must go beyond the pleadings and, by its own evidence or by citing appropriate materials in the record, show by sufficient evidence that there is a genuine dispute for trial. *See Celotex*, 477 U.S. at 324. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . ." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A "scintilla of evidence" in support of the nonmoving party's position is insufficient; "there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson*, 477 U.S. at 252. Moreover, "a party cannot manufacture a genuine issue of material fact merely by making assertions in its legal memoranda." *S.A. Empresa de Viacao Aerea Rio*

*Grandense v. Walter Kidde & Co., Inc.*, 690 F.2d 1235, 1238 (9th Cir. 1982). Rather, Rule 56(e) compels the non-moving party to "set out specific facts showing a genuine issue for trial" and not to "rely merely on allegations or denials in its own pleading." Fed. R. Civ. P. 56(e); *Matsushita Elec. Indus. Co.*, 475 U.S. at 586–87. Rule 56(c) mandates the entry of summary judgment against a party who, after adequate time for discovery, fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which the party will bear the burden of proof at trial. *See Celotex*, 477 U.S. at 322–23.

The Ninth Circuit has "held consistently that courts should construe liberally motion papers and pleadings filed by *pro se* inmates and should avoid applying summary judgment rules strictly." *Soto v. Sweetman*, 882 F.3d 865, 872 (9th Cir. 2018) (quoting *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010)). While prisoners are relieved from strict compliance, they still must "identify or submit some competent evidence" to support their claims. *Soto*, 882 F.3d at 872.

*2. Eighth Amendment Deliberate Indifference*

The Eighth Amendment prohibits punishment that involves the "unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)); *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004). The Eighth Amendment's Cruel and Unusual Punishment Clause is violated when prison officials provide inadequate medical care in a manner that is deliberately indifferent to a prisoner's serious medical needs. *See Estelle*, 429 U.S. at 105. Medical needs include a prisoner's "physical, dental, and mental health." *Hoptowit v. Ray*, 682 F.2d 1237, 1253 (9th Cir. 1982).

To show "cruel and unusual" punishment under the Eighth Amendment, Plaintiff must point to evidence in the record from which a trier of fact might reasonably conclude that Defendant's medical treatment placed him at risk of "objectively, sufficiently serious" harm and that Defendant had "sufficiently culpable state[s] of mind" when he either provided or denied him medical care. *Wallis v. Baldwin*, 70 F.3d 1074, 1076 (9th

Cir. 1995) (internal quotations omitted). Thus, there is both an objective and a subjective component to an actionable Eighth Amendment violation. *Clement v. Gomez*, 298 F.3d 898, 904 (9th Cir. 2002); *Toguchi*, 391 F.3d at 1057 ("To establish an Eighth Amendment violation, a prisoner 'must satisfy both the objective and subjective components of a two-part test.'") (quoting *Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir. 2002)).

The objective component is generally satisfied so long as the prisoner alleges facts to show that his medical need is sufficiently "serious" such that the "failure to treat [that] condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Clement*, 298 F.3d at 904 (quotations omitted); *see also Doty v. County of Lassen*, 37 F.3d 540, 546 (9th Cir. 1994) ("serious" medical conditions are those a reasonable doctor would think worthy of comment, those which significantly affect the prisoner's daily activities, and those which are chronic and accompanied by substantial pain).

The subjective component requires Plaintiff to demonstrate that Defendant had the culpable mental state: "'deliberate indifference' to a substantial risk of serious harm." *Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998) (quoting *Farmer v. Brennan*, 511 U.S. 825, 835 (1994)). Deliberate indifference is evidenced only when "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837; *Toguchi*, 391 F.3d at 1057. Deliberate indifference "may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988).

**B. Analysis**

Dr. Shakiba argues that he could not have been deliberately indifferent to Plaintiff's medical needs before his first encounter with Plaintiff on September 26, 2019, and that he treated Plaintiff regularly thereafter with concerned care. *See* Doc. No. 28 at

12–13. Plaintiff argues in opposition that the treatment he received was inadequate. *See* Doc. No. 32.

As an initial matter, Plaintiff complains about the treatment he received pre- and post-bunionectomy for the period of time spanning May–October 2019. *See generally* FAC. However, Defendant did not become Plaintiff's PCP until late September and only treated Plaintiff for the first time on September 26, 2019. Def. Decl. ¶ 5; Feinberg Decl. ¶ 15; Hodges Decl. ¶ 2. Thus, the majority of Plaintiff's complaints relate to treatment provided exclusively by medical professionals other than Defendant. Def. Decl. ¶ 5. Absent any personal participation, Dr. Shakiba may not be held liable for the actions of other correctional or medical personnel. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Accordingly, the Court **GRANTS** Dr. Shakiba's motion in this respect.

Between September 26, 2019 and October 24, 2019, Dr. Shakiba saw Plaintiff seven times for post-operative care.[3] During this time, Dr. Shakiba examined Plaintiff's foot, granted Plaintiff's request for lay-in from work, ordered x-rays and blood work, prescribed pain medication and oral antibiotics, made several attempts to contact Dr. Armory for post-operative instructions, and ordered follow-up appointments with Dr. Armory that included an urgent request for the pin removal. *See* Def. Ex. B at 70–90. The evidence, even viewed in Plaintiff's favor, shows that the treatment Dr. Shakiba provided during this time was neither medically unacceptable under the circumstances nor in conscious disregard of a substantial risk of serious injury. Nonetheless, the Court turns to each of Plaintiff's challenges.

*1. Pin Removal*

To begin, Plaintiff appears to take issue with the delay in removing the surgical pin. *See* FAC at 9 (alleging that Dr. Armory stated the pin should have been taken out sooner and medical staff at RJD could have made a more concerted effort to ascertain

---

[3] Those seven visits were: September 26, October 11, October 14, October 15, October 16, October 18, and October 24. *See* Def. Decl. ¶¶ 5–11.

follow-up after care instruction). As noted above, it is undisputed that a partially exposed surgical pin remained in Plaintiff's foot post-bunionectomy. According to Dr. Shakiba and Dr. Feinberg, the hospital records from the bunionectomy that RJD received from Dr. Armory and Tri-City contained no discharge instructions. Def. Decl. ¶5; Feinberg Decl. ¶ 10 (citing Def. Ex. B at 16–53).

The contention that Dr. Shakiba, or any other medical professional at RJD, could have tried harder to obtain wound care or follow-up instructions is belied by the records. As noted above, Dr. Shakiba attempted to contact Dr. Armory's office three times to no avail. On September 26, 2019, Dr. Shakiba left his number with Dr. Armory's staff but never received a call back. Def. Ex. B at 70. On October 15, 2019, Dr. Shakiba again called Dr. Armory, this time at both of his office locations, but was unable to reach him. Def. Ex. B at 81. This, in addition to Dr. Goyal's efforts on September 6, contacting Dr. Armory's office and the offsite scheduling department. Def. Ex. B at 65–66.

However, it does not appear to be an undisputed fact that the record contains no discharge instructions. *See* Def. Ex. B at 41. True, the "Transition of Care Document" contained no follow-up instructions, namely, the "Assessment and Plan" and "Hospital Discharge Instructions" sections note "No data available for this section." Def. Ex. B at 29, 34. But a review of the record reveals a document entitled "Patient Discharge Instructions" that identifies, among other things, instructions to "maintain [s]plint[.] Patient is non-weightbearing x 4 weeks[.] Follow up telemed clinic for pin removal at four weeks."[4] Def. Ex. B at 41.

It is not clear when this document was transmitted to RJD and when Dr. Shakiba reviewed it, if ever. It is appended to Dr. Feinberg's declaration, and Dr. Feinberg

---

[4] Neither Defendant nor Dr. Feinberg acknowledge this document and its contents. Consequently, it is unclear if this information was overlooked or if it has no bearing on their conclusions that Dr. Armory did not provide discharge instructions. Absent any explanation from Defendant or his supporting declarants, the Court views this evidence in Plaintiff's favor and finds that it is evidence of discharge instructions from Dr. Armory.

explains that these documents comprise Plaintiff's hospital records from the bunionectomy. Feinberg Decl. ¶ 10. However, as noted above, multiple medical personnel noted the absence of this information, specifically regarding the pin removal, and undertook various efforts to obtain these instructions from Dr. Armory. *See, e.g.*, Def. Ex. B at 66.

Even assuming this information was available, it is clear Dr. Shakiba did not see it. At the September 26 appointment, Dr. Shakiba recorded the following:

> Patient with a history of bunionectomy 8/29, seen on 9/6 by PCP however PCP was unable to find any wound are instruction or follow-up instruction or instruction regarding removal of the pain. That provider contacted orthopedic office was unable to get a hold of the doctor. I saw the patient for follow-up again still we had no wound care instruction and instruction regarding the removal of the pain. I contacted Dr. Amer's [sic] office he was not available I left my phone number his office personnel told me someone would reach me but no one ever called back.

Def. Ex. B at 70.[5] Dr. Shakiba reiterated and concluded: "Unable to reach the orthopedic surgeon by phone and there was no call back regarding instructions for follow-up will place order for face-to-face follow-up with Dr. Armory within 2 weeks." *Id.*

This information was, however, available to and reviewed by RJD personnel by at least October 6. Def. Ex. B. at 72 (RN Javier noting these instructions "[u]pon document review"). Although, Dr. Shakiba never mentioned or otherwise recorded that he viewed it. *See generally*, Def. Ex. B.

On October 11, 2019, Plaintiff saw Dr. Armory for the appointment scheduled by Dr. Shakiba. Feinberg Decl. ¶¶ 16–19. Plaintiff saw Dr. Shakiba after he returned from his appointment with Dr. Armory on that date. Def. Decl. ¶¶ 6–7. Dr. Shakiba recorded that he again had no instructions from Dr. Armory, this time from the most recent

---

[5] It appears that the two comments regarding "removal of the pain" contains a typographical error that should read: "removal of the pin."

appointment. Def. Decl. ¶ 6; Def. Ex. B at 77. Nonetheless, Dr. Shakiba granted Plaintiff's request for a "lay-in" from work. Def. Decl. ¶ 6.

Dr. Shakiba saw Plaintiff on October 14, during which time Plaintiff was complaining about pain in his foot. Def. Decl. ¶ 7; Def. Ex. B at 79. Dr. Shakiba noted that he was "[s]till awaiting the notes from the recent orthopedic surgery follow-up." Def. Ex. B at 79. Dr. Shakiba nonetheless prescribed Plaintiff nortriptyline and ibuprofen for the pain. Def. Ex. B at 79.

Plaintiff saw Dr. Shakiba the following day, on October 15. Def. Decl. ¶ 8; Def. Ex. B at 81. Dr. Shakiba observed that Plaintiff's foot showed signs of infection and so he prescribed Plaintiff oral antibiotics. Def. Ex. B at 81. Dr. Shakiba again attempted to contact Dr. Armory, this time at both of his offices, unsuccessfully. Def. Ex. B at 81. Dr. Shakiba explains, and contemporaneously recorded, that during this appointment he reviewed Dr. Armory's most recent handwritten note which, although illegible, he determined mentioned immediate removal of the pin. Def. Decl. ¶ 8; Feinberg Decl. ¶ 23; Def. Ex. B at 81. Dr. Shakiba submitted an urgent request for removal of the pin. Def. Decl. ¶ 8; Def. Ex. B at 81.

A mere delay in treatment, without more, is insufficient to state a claim of deliberate indifference. *Shapley v. Nev. Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985). Further, "'[a]n *inadvertent* failure to provide adequate medical care' does not, by itself, state a deliberate indifference claim for § 1983 purposes." *Wilhelm v. Rotman*, 680 F.3d 1113, 1122 (9th Cir. 2012) (quoting *McGuckin v. Smith*, 974 F.2d 1050, 1060 (9th Cir. 1994)). Rather, the indifference must be substantial and purposeful; negligence, inadvertence, or differences in medical judgment or opinion do not rise to the level of a constitutional violation. *See Toguchi*, 391 F.3d at 1060 (finding negligence constituting medical malpractice is not sufficient to establish an Eighth Amendment violation); *see also Wilhelm*, 680 F.3d at 1122 (citing *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006)); *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996), *cert. denied*, 519 U.S. 1029 (1996); *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989).

The record is clear that Dr. Shakiba was not deliberately indifferent with respect to the pin removal. When Dr. Shakiba ultimately received Dr. Armory's note for removal of the pin on October 15, 2019, he promptly complied and immediately submitted an urgent request. The evidence demonstrates he did not know of a need for removal sooner: at every prior appointment, Dr. Shakiba recorded having no instructions from Dr. Armory. Def. Ex. B at 70, 77, 79. Even if the discharge instructions, noting a four-week "telemed" follow-up for the pin removal was available to Dr. Shakiba as early as September 26, Plaintiff does not argue, and there is no evidence, that Dr. Shakiba saw this instruction and ignored it. Rather, Dr. Shakiba noted a lack of instructions, undertook efforts to obtain that information, and, in the absence of such information, scheduled Plaintiff for an in-person appointment with Dr. Armory within two weeks. Thus, Dr. Shakiba treated Plaintiff with concerned post-operative care despite a lack of information from Dr. Armory. Even assuming this belief was mistaken, an inadvertent delay in treatment without more does not rise to the level of deliberate indifference. As there is no evidence that Dr. Shakiba was aware of a need to remove the pin prior to October 15, he could not have been deliberately indifferent to such a need. Accordingly, any failure by Dr. Shakiba to schedule the procedure sooner does not rise to the level of deliberate indifference.

*2. Bandages/Dressings*

Plaintiff also appears to challenge the frequency that his bandages were changed. *See* Doc. No. 32 at 1; Doc. No. 36 at 1.[6] It is unclear how often Plaintiff's dressings were

---

[6] Plaintiff submitted a "reply" to Defendant's summary judgment motion. Doc. No. 36 at 1. As the Court explained to Plaintiff in its Order Providing Klingle/Rand Notice, Plaintiff as the opposing party was to file an opposition, and Defendant, as the moving party, then had the opportunity to file a reply. *See* Doc. No. 30 at 2. Thus, Plaintiff's filing is a sur-reply, which is not generally authorized. *See* CivLR 7.1. Here, Defendant did not present new arguments or evidence in his reply. *See* Doc. No. 33. Nonetheless, given Plaintiff's *pro se* status, the Court exercises its discretion and considers this filing. *See De Souza v. Dawson Tech., Inc.*, No. 21-CV-1103 JLS (MSB), 2021 U.S. Dist. LEXIS 136089, at *2 (S.D. Cal. July 21, 2021) (explaining that a decision to grant or deny leave to file a sur-reply is committed to the "sound discretion" of the court) (quoting *Brady v. Grendene USA, Inc.*, No. 3:12-cv-

changed and Plaintiff's contentions in this respect were not submitted in evidentiary form. Regardless, even assuming Plaintiff went "39 days" without his bandages being changed, *see* Doc. No. 32 at 1, there is no evidence that Dr. Shakiba knew Plaintiff's bandages needed changing.

On October 6, 2019, a nurse at RJD who examined Plaintiff's foot recorded that "[t]he original surgical dressing appeared to be soiled and barely intact." Def. Ex. B at 72. The 39-day period therefore appears to relate to the time between the surgery on August 29 and the October 6 appointment. Plaintiff only saw Dr. Shakiba once during this this period of time. At the September 26, 2019 appointment, Dr. Shakiba recorded that Plaintiff's dressings were "in place" but did not otherwise note whether they were dirty or needed changing. Def. Ex. B at 70. Dr. Shakiba also recorded, however, that Plaintiff was not in distress and did not appear to be in acute pain. Def. Ex. B at 70. Plaintiff does not argue or put forth evidence that he presented with soiled bandages at this appointment. And by the October 11 appointment, Dr. Shakiba recorded Plaintiff's dressings were "dry." Def. Ex. B at 77.

None of Dr. Armory's notes and instructions in the record mention changing the bandages, and thus, there is no evidence that Dr. Shakiba was aware of any post-operative need for regular changing. Additionally, Plaintiff puts forth no evidence that Dr. Shakiba knew that his bandages were soiled and chose not to change them, or otherwise interfered with the changing of soiled bandages. Rather, Plaintiff merely disagrees with the frequency that his bandages were changed. *See* Doc. No. 36 at 2 ("A reasonable prison physician would have order[ed] at least the changing of dressing as regular treatment to his patient."). This is insufficient to survive summary judgment as "[a] difference of opinion between a physician and the prisoner - or between medical professionals - concerning what medical care is appropriate does not amount to deliberate

---

0604-GPC-KSC, 2015 U.S. Dist. LEXIS 151879, at *8 (S.D. Cal. Nov. 6, 2015) (internal quotation marks omitted)).

indifference." *Snow v. McDaniel*, 681 F.3d 978, 987 (9th Cir. 2012) (internal citations omitted). As there is no evidence that Dr. Shakiba was aware of a need to change Plaintiff's bandages, including more frequent or regular changing, it cannot be said that he was deliberately indifferent to this need. *See Jackson v. Dator*, No. 2:15-CV-1675-JAM-DMC-P, 2019 U.S. Dist. LEXIS 151594, at *37 (E.D. Cal. Sep. 4, 2019) (finding no deliberate indifference where the defendant was not aware that the bandages were soiled).

*3. Infection*

To the extent Plaintiff challenges the treatment he received regarding the infection, the record similarly reveals no triable issue. *See* Doc. No. 36 at 1 (arguing that Dr. Shakiba "only order[ed] antibiotics after Plaintiff got infection from not having dressing change[d]"). When Plaintiff first complained about pain in his foot on October 14, 2019, Dr. Shakiba checked for redness and swelling, and detecting neither, prescribed Plaintiff pain medication. Def. Decl. ¶ 7; Def. Ex. B at 79. When Plaintiff presented with signs of infection at an appointment the following day, Dr. Shakiba called Dr. Armory's office twice and ordered antibiotics. Def. Decl. ¶ 8; Def. Ex. B at 81. Thereafter, Dr. Shakiba examined Plaintiff on October 16 and 18 to ensure that he was responding to the antibiotics, which he was. This hardly evidences deliberate indifference. Further, even assuming Dr. Shakiba knew that soiled dressings could lead to infection, as discussed above, there is no evidence that Dr. Shakiba knew Plaintiff's bandages were soiled and thus, no evidence Dr. Shakiba consciously disregarded a risk to Plaintiff's health. Accordingly, Dr. Shakiba was not deliberately indifferent with respect to the infection.

*4. Ambulation Device*

Finally, Plaintiff takes issue with the fact that he was not issued an ambulation device. Doc. No. 32 at 1; FAC at 8. Dr. Shakiba denies that Plaintiff ever requested an ambulatory device at any of his appointments. Def. Decl. ¶ 15. To the extent Plaintiff disputes this fact, *see* DSS No. 24, such a dispute is immaterial.

Plaintiff was provided crutches on August 30, 2019. *See* Feinberg Decl. ¶ 12; Def. Ex. B at 61. Responding to this statement in Dr. Feinberg's declaration, Plaintiff seems to argue that this was only after he demanded crutches, having hopped around from August 28–30. Doc. No. 32 at 2. However, as noted above, Dr. Shakiba did not treat Plaintiff for the first time until September 26 and cannot be held liable for the treatment provided by others.

It is unclear what happened to these crutches. The record suggests that they were only issued for temporary use. Def. Ex. B at 61 (noting "temp crutches given"). Plaintiff was, however, still using crutches as of September 26, *see* Def. Ex. B at 70 (Dr. Shakiba recording that during Plaintiff's September 26, 2019 appointment the dressings were "in place using crutches"), and possibly through early October, *see* Def. Ex. B at 71; Pl. Depo. 107:9–10.[7] There is no mention of these crutches, or any other ambulation device, in the medical record after September 26. Plaintiff nonetheless contends he has since been issued a permanent walker. FAC at 10.

Even accepting Plaintiff's contention that he asked for an ambulation device, there is no evidence that Dr. Shakiba was deliberately indifferent to a serious medical need. The Patient Discharge Instructions note that Plaintiff was to be "non-weightbearing" for four weeks—which predates Dr. Shakiba's care. Nonetheless, the record reveals that Plaintiff was provided crutches for this period of time, and possibly longer. There is no evidence that an ambulation device was essential, required, or necessary to Plaintiff's treatment during the period of time that Dr. Shakiba treated him. There is similarly no evidence Dr. Armory ordered or directed that Plaintiff be provided an ambulation device from September 26 onward, and his notes from the October 11 visit and the October 23

---

[7] The record reveals that in early October 2019, possibly October 4 or 5, Plaintiff was involved in an incident with another inmate, during which time the pin was pushed further into his toe. Pl. Depo. 107:7–15 (stating that another inmate backed into Plaintiff and pushed the pin in); Def. Ex. B at 71 (explaining in a Form 7362 dated October 5, 2019, that the pin got pushed further into his toe). Plaintiff explains that he was on crutches during the time of this incident. Pl. Depo. 107:9–10.

pin removal surgery contain no mention of an ambulation device or Plaintiff's weightbearing status. Def. Ex. B at 74–75, 86–88. Further, Plaintiff does not argue or put forth evidence that he sustained substantial harm as a direct result of Dr. Shakiba's alleged failure to provide him an ambulation device. To the extent Plaintiff unfortunately suffered from pain, the record is clear that Dr. Shakiba provided prompt medical attention during this time, prescribing him pain medication and excusing him from work when requested. Plaintiff's personal opinion that Dr. Shakiba should have provided him with additional or different treatment, such as an ambulation device, does not provide a basis for imposing liability under section 1983. *See Shebby v. Adams*, No. 1:03-cv-06487-LJO-NEW (DLB) PC, 2007 U.S. Dist. LEXIS 32290, at *10–11 (E.D. Cal. May 1, 2007) (finding plaintiff's mere disagreement with the defendant's failure to provide him with crutches did not state an Eighth Amendment claim), *report and recommendation adopted by* 2007 U.S. Dist. LEXIS 63383 (E.D. Cal. Aug. 27, 2007); *see also Shebby v. Adams*, No. 1:03-cv-06487-LJO-NEW (DLB) PC, 2007 U.S. Dist. LEXIS 32290, at *10–11 (E.D. Cal. May 1, 2007)

*5. Summary*

Plaintiff brings an Eighth Amendment medical care claim against Dr. Shakiba, challenging the treatment he received prior to and following his August 29, 2019 bunionectomy. As Dr. Shakiba only began treating Plaintiff on September 26, he is entitled to judgment with respect to Plaintiff's complaints that predate his treatment. Further, during the September–October 2019 period that Plaintiff complains about, the record is clear that Dr. Shakiba did not know of and disregard an excessive risk to Plaintiff's health, *see Farmer*, 511 U.S. at 837, but rather provided concerned care. During the seven appointments, Dr. Shakiba examined Plaintiff's foot, prescribed pain medication and antibiotics, granted Plaintiff lay-in from work, ordered x-rays and blood work, and scheduled Plaintiff for in-person appointments with Dr. Armory, including an urgent request for the pin removal. Dr. Shakiba contends he had no discharge instructions from Dr. Armory. The record supports his position: other medical personnel

noted the absence of this information and Dr. Shakiba called Dr. Armory's office seeking post-operative instructions numerous times. Even assuming Dr. Shakiba had access to the Patient Discharge Instructions, there is no evidence that he saw them. The record further reveals no evidence that Dr. Shakiba consciously disregarded an excessive risk to Plaintiff's medical needs with respect to the pin removal, bandages, infection, and ambulation device. As Plaintiff has not raised a triable issue of fact as to Dr. Shakiba's alleged deliberate indifference, the Court **GRANTS** Dr. Shakiba's motion.

Because the Court finds that Dr. Shakiba is entitled to summary judgment as to the merits of Plaintiff's claim, it need not reach his alternative requests for judgment as to qualified immunity, *see Saucier v. Katz*, 533 U.S. 194, 201 (2001) ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity."); *County of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998) ("[The better approach to resolving cases in which the defense of qualified immunity is raised is to determine first whether the plaintiff has alleged the deprivation of a constitutional right at all."), and punitive damages.

## III. CONCLUSION

Based upon the foregoing, the Court **GRANTS** Defendant's motion for summary judgment. The Clerk of Court is directed to enter judgment in Defendant's favor and close this case.

**IT IS SO ORDERED**.

Dated: April 13, 2023

HON. MICHAEL M. ANELLO
United States District Judge